UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦

**Trudy L. Ramstine,**

**Plaintiff,**

**-v-**                                            **3:08-CV-942 (NAM/DEP)**

**The Hartford Life and Accident Insurance Company,**

**Defendant.**

✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦

APPEARANCES:
Olinsky & Shurtliff
Howard Olinsky, Esq., of counsel
300 South State Street, 5th Floor
Syracuse, New York 13202
Attorney for Plaintiff

Schrader, Israely, DeLuca & Waters, LLP
Robert S. DeLuca , Esq., of counsel
2821 Wehrle Drive, Suite 3
Williamsville, New York 14221
Attorney for Defendant

**Hon. Norman A. Mordue, Chief U.S. District Judge:**

**MEMORANDUM-DECISION AND ORDER**

**INTRODUCTION**

This action under the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. §

1001, *et seq.*, concerns a Group Insurance Policy, No. GLT-674180 ("Policy"), issued by

defendant to plaintiff's former employer, BAE Systems North America ("BAE"). Plaintiff claims

defendant wrongfully terminated her waiver of premium benefits under the group life insurance

portion of the Policy based on defendant's determination that plaintiff failed to prove she was

disabled within the meaning of the applicable Policy provision. The first cause of action of the

complaint alleges wrongful denial of benefits, and the second alleges defendant breached its

fiduciary duty to plaintiff.  Defendant moves (Dkt. No. 24) for summary judgment dismissing the action.  Plaintiff cross-moves (Dkt. No. 25) for summary judgment.  As set forth below, upon review of the entire administrative record, the Court grants defendant's motion, denies plaintiff's motion, and dismisses the action.

## FACTS

**Background**

The undisputed facts set forth below are drawn from the administrative record.[1]  On May 20, 2005, plaintiff ceased working as an Operations Associate for BAE due to a herniated cervical disc and neck pain.  In July 2005, plaintiff's neurosurgeon, Daniel D. Galyon, M.D., performed on plaintiff an "anterior cervical diskectomy with fusion and plating and interbody fixation from C5 to C6 with the use of Tisseel for incidental durotomy."  Defendant approved plaintiff's long term disability ("LTD") benefit claim on January 20, 2006, retroactive to November 19, 2005 (the end of the 180-day elimination period), and notified her that she may also be eligible for waiver of premium benefits under the group life insurance portion of the Policy.  On July 20, 2007, plaintiff underwent surgical repair of a left rotator cuff tear by Mark V. Wilson, M.D., an orthopedic surgeon.  Defendant notified plaintiff on October 22, 2007 that her waiver of premium benefits had been approved, effective February 20, 2006.

Subsequently, defendant terminated plaintiff's waiver of premium benefits effective March 7, 2008.  In the termination letter, defendant summarized recent medical reports it had

---

[1] Plaintiff's counsel failed to comply with the requirement in N.D.N.Y. Local Rule 7.1(a)(3) that the party opposing a summary judgment motion shall file a response to the movant's Statement of Material Facts that "shall mirror the movant's Statement of Material Facts by admitting and/or denying each of the movant's assertions in matching numbered paragraphs. Each denial shall set forth a specific citation to the record where the factual issue arises."  Nevertheless, the Court has reviewed the entire record.

received from Drs. Wilson and Galyon, as well as from plaintiff's family doctor, Kazimieras A. Snieska, M.D.  Based on these reports, defendant concluded that plaintiff "should be able to return to work part time on light duty to any occupation" with specified restrictions, and that therefore "the evidence obtained in support of [plaintiff's] claim does not establish that [she] continue[s] to meet the definition of Disabled" in the waiver of premium benefits portion of the Policy.

On March 18, 2008, plaintiff appealed defendant's termination of her waiver of premium benefits.  On May 27, 2008, defendant denied the appeal and upheld the termination of waiver of premium benefits.  This action followed.

**The Policy**

The Policy issued by defendant to BAE, plaintiff's former employer, provides benefits for eligible employees including LTD benefits and life insurance.  The Policy specifically provides that defendant has "full discretion and authority to determine eligibility for benefits and to construe and interpret all terms and provisions of the Policy."

For purposes of LTD benefits, the Policy defines "disability" as follows:

> Disability or Disabled means that during the Elimination Period and for the next 24 months you are prevented by:
> 1. accidental bodily injury;
> 2. sickness;
> ***
> from performing <u>one or more of the Essential Duties of Your Occupation</u>, and as a result your Current Monthly Earnings are no more than 80% of your Indexed Pre-Disability Earnings.
>
> After that, you must be so prevented from performing <u>one or more of the Essential Duties of Any Occupation</u>.

(Emphasis added.)  It defines "Any Occupation" as follows:

-3-

>    **Any Occupation** means an <u>occupation for which you are qualified by
>    education, training or experience</u>, and that has an earnings potential greater
>    than an amount equal to the lesser of the product of your Indexed pre-
>    disability Earnings and the Benefit Percentage for which you enrolled and
>    the Maximum Monthly Benefit shown in the Schedule of Insurance.

(Emphasis added.)  Defendant found plaintiff eligible for LTD benefits under the "Your

Occupation" provision as of November 19, 2005 (after the 180-day elimination period).  After the

24-month period elapsed on November 19, 2007, defendant found plaintiff eligible for LTD

benefits under the "Any Occupation" provision.

The Policy also provides for the waiver of life insurance premiums so long as the insured

meets the definition of "disabled" for purposes of waiver of premium benefits.  The waiver of

premium provision in the group life insurance portion of the Policy provides:

>    **When will We waive premium?**
>    We will waive premium after proof that You are Disabled is provided by
>    an attending physician licensed to practice in the United States and We
>    approve the proof. ***

The Policy definition of "disabled" as it relates to waiver of premium benefits reads:

>    Disabled means that You have a <u>condition that prevents You from doing
>    any work for which You are or could become qualified by education,
>    training or experience</u> and it is expected that this condition will last for at
>    least nine consecutive months from Your last day of work or You have
>    been diagnosed with a life expectancy of 6 months or less.

(Emphasis added.)  If a claimant is no longer disabled, the Policy provides as follows:

>    If, for any reason, You are no longer Disabled, Your premium will no
>    longer be waived. On that date, You may or may not return to work.

Defendant notified plaintiff on October 22, 2007 that her waiver of premium benefits had been

approved, effective February 20, 2006 (that is, 90 days after the effective date for LTD benefits as

provided in the Policy).

-4-

**Termination of Waiver of Premium Benefits**

The record evidence in connection with defendant's termination of waiver of premium benefits as of March 7, 2008 includes the following.  Defendant obtained an Attending Physician's Statement of Functionality from Dr. Galyon, dated December 20, 2007, noting that plaintiff's primary diagnosis remained "residual neck pain following cervical fusion on 7/20/05"; that her "gait remains stable w/ use of cane, remains limited in forward flexion & extension"; that she took Vicodin for her condition; that in the "general workplace environment" she was able to sit for two hours at a time, to stand for two hours at a time, and to walk for two hours at a time; and that she is able occasionally to lift or carry up to – but no more than – ten pounds with both hands, finger/handle with both hands, bend at the waist, kneel or stoop, drive, and reach at all levels with both hands.

On February 7, 2008, defendant requested updated information from plaintiff's physicians. In his response, marked "received" by defendant on February 18, 2008 ("February 18, 2008 Report"), Dr. Galyon commented that he had last examined plaintiff on February 4, 2008; that she had decreased range of motion in her cervical spine and muscle spasms; that he scheduled a three-month follow-up examination of plaintiff; that no treatments were planned; that her prognosis was "fair"; that her activities were limited by her need to change between sitting and standing every 30 minutes (as needed); and that she should not lift, push or pull more than 20 pounds. In response to the question whether plaintiff was "capable of performing part time work (any occupation) on a reasonable and consistent basis beginning 3/1/2008" he did not check "yes" or "no" but wrote: "She does have other medical problems including shoulder surgery."  He added: "I would recommend a FCE for her functional status and if she would be employable."

In response to defendant's request for updated information, Dr. Wilson submitted a report, received by defendant on February 14, 2008 ("February 14, 2008 Report"), stating that he had last examined plaintiff on September 28, 2007 with regard to her left shoulder and on January 29, 2008 with regard to her right knee.  Dr. Wilson stated, with respect to her left shoulder, that plaintiff's range of motion had improved, though she still had some pain; that she was receiving physical therapy for the shoulder; and that her prognosis was "good."  With respect to her right knee, Dr. Wilson stated that she had increased pain, patella femoral pain and crepitation; that she was receiving a synthetic lubricant injection for her knee; and that her prognosis was "guarded."  Dr. Wilson stated that plaintiff should not engage in any lifting, pushing or pulling of more than 10 pounds, should not work overhead, should not stand or walk for more than 45 minutes at a time (without a sitting 10-15 minute rest), and should not climb.  In response to the question whether plaintiff "capable of performing part time work (any occupation) on a reasonable and consistent basis beginning 3/1/2008" he checked "Yes" and wrote "light duty."  He added that plaintiff "[s]hould be able to return to light duty and increase hours in a controlled fashion."

Kazimieras A. Snieska, M.D., plaintiff's family doctor, wrote to defendant on February 22, 2008, stating that he had last examined plaintiff on March 2007, at which time she complained that her legs were very weak and "giving out on her"; that she had "suffered a contusion to her knee in November; and that she had been "complaining of weakness in the right knee and also pain in the shoulder since that time."  He stated that she was recently diagnosed as having a rotator cuff tear in the right shoulder and that her treatment was provided by Drs. Wilson and Galyon.  He added: "I truly feel that this patient has been damaged permanently through all of her injuries.  I do not think that she is capable of returning to work in any capacity at this time."

On March 7, 2008, defendant issued a letter referring to the physician's reports and terminating plaintiff's waiver of premium benefits, stating:

> Based on the information provided by your doctors above, you should be able to return to work part time on light duty to any occupation with the following restrictions: refrain from lifting with your left shoulder, no pushing or pulling greater than 10 [pounds], no working overhead, no prolonged standing or walking greater than 45 minutes without sitting down for 10-15 minutes per hour, shifting sit/stand position every 30 minutes and no climbing.

> In conclusion, The Hartford has determined that the evidence obtained in support of your claim does not establish that you continue to meet the definition of Disabled. Accordingly, your claim is terminated effective 3/7/2008.

The letter advised plaintiff of her right to appeal.

**Plaintiff's Appeal of the Termination of the Waiver of Premium Benefits**

By letter dated March 18, 2008, plaintiff appealed the termination of her waiver of premium benefits.  She wrote that she had called the offices of Drs. Galyon and Snieska and "they say they do not know where you got any information that [she] was able to work any job."  She adds that Dr. Galyon forwarded her the Attending Doctor's Report and Carrier/Employer Billing Form he had recently completed concerning plaintiff's claim for Workers' Compensation benefits ("Workers' Comp Report").  Based on his examination of plaintiff on February 4, 2008, Dr. Galyon filled out the form as follows: to the question whether plaintiff was working, he checked "No"; and to the question whether she was "Unable to perform regular duties or work" he checked "Yes" and indicated that her degree of impairment was "Partial."  In response to questions which were to be completed only "when maximum medical improvement has been reached" he stated that the loss to her extremity was 75% and answered "No" to the question whether the patient "can do any type of work."

Defendant assigned the appeal to Edna Golych, Appeal Specialist.  On May 8, 2008, defendant referred plaintiff's medical records to University Disability Consortium for an independent medical record review, which was performed by James B. Boscardin, M.D., a board-certified orthopedic surgeon.  Dr. Boscardin's letter report, dated May 20, 2008, summarized plaintiff's medical records and reported that he had spoken by telephone with each of plaintiff's physicians.  He wrote that plaintiff "has been followed by the operating surgeons periodically and these doctors have indicated that her functional abilities exist at a sedentary level with restrictions."

Dr. Boscardin noted that Dr. Galyon's December 20, 2007 report included "restrictions and limitations ... which basically allowed a sedentary level of function, no overhead work, no frequent flexion of the neck, no lifting over 10 [pounds] and frequent change of positions which included sitting for two hours, standing for two hours and walking two hours in an alternating fashion."  According to Dr. Boscardin, in their teleconference on May 16, 2008, Dr. Galyon stated that he had last seen plaintiff on May 8, 2008, "at which time he felt that she was capable of full time sedentary work, no lifting over 10 [pounds], no working overhead, no frequent flexion of the spine, sitting, walking and standing should be alternated two hour intervals and she was capable of full time employment."  There is no written report from Dr. Galyon reflecting this opinion.

With regard to the records provided by Dr. Wilson, Dr. Boscardin noted that Plaintiff's "left shoulder was diagnosed with a rotator cuff tear which was treated with a surgical repair on 7/10/07 and as of the last visit of 9/28/07, Dr. Wilson advised sedentary activity with lifting not to exceed 10 [pounds]."  When Dr. Boscardin spoke with Dr. Wilson by telephone on May 13, 2008,

Dr. Wilson "confirmed" his opinion that Plaintiff "was capable of sedentary work, no lifting over 10 [pounds] and to limit working with the left arm above the shoulder" and that she "could do this on a full time basis."

Dr. Boscardin also discussed Dr. Snieska's opinion.  He noted that, when Dr. Snieska wrote on February 22, 2008 that plaintiff was "unable to work because of continued complaints which included stiffness of the neck, self-reported weakness in the arm and inability to perform most activities," Dr. Snieska had not seen plaintiff since March 2007.  He also noted that in their teleconference on May 16, 2008, Dr. Snieska told him that as of April 28, 2008 plaintiff "complained of pain in her neck, decreased range of motion, weakness in her arms and inability to do anything"; that her husband had recently died; and that plaintiff was suffering from panic attacks.  Dr. Snieska stated that plaintiff "was not capable of returning back to sedentary activities because of her complaints and her panic attacks/anxiety depression." With respect to Dr. Snieska's opinion, Dr. Boscardin wrote:

> The family practitioner, Dr. Snieska, indicated that [plaintiff] was under significant anxiety/depression issues. She recently lost her husband secondary to COPD (chronic obstructive pulmonary disease) and she was suffering from panic attack that would keep her from performing any sort of duties including sedentary function. He indicated that she had complained of stiffness in the neck, neck pain and right arm weakness. This is contrary to what the neurosurgeon had indicated based on a recent office visit of 5/8/08. This also was contrary to what the shoulder surgeon had indicated that sedentary activities were appropriate.

In his report, Dr. Boscardin concluded:

> [Plaintiff] is not precluded from sedentary full time work which limits lifting to 10 [pounds] with additional restrictions of no overhead work, no work with the left arm above the left shoulder and no work that requires prolonged flexion of the cervical spine. She requires an opportunity to change position every two hours and she may walk or stand frequently. These restrictions and limitations are permanent and effective from 3/8/08

onward.  I must add that the family practitioner felt that she reported decreased range of motion of the cervical spine, some arm weakness and inability to perform tasks but this was contrary to what the two surgeons had related to me.  The family practitioner referenced anxiety, depression and panic attacks.  I speak from an orthopedic standpoint in establishing the above restrictions and limitations.  I have no expertise in commenting on these anxiety, depression and panic attack situations.  I believe the opinions expressed above are based on a reasonable degree of medical and surgical certainty....

In its appeal decision, by letter from Ms. Golych dated May 27, 2008, defendant upheld the decision to terminate plaintiff's waiver of premium benefits as of March 7, 2008, stating: "Our determination remains that the documentation on file, taken as a whole, supports our prior decision."  The decision stated that the review by the Appeal Unit was "conducted separately from the individual who made the original decision to terminate benefits and without deference to said decision."  The appeal decision reviewed plaintiff's medical history beginning with her neck surgery in July 2005, and summarized the reports and office notes received from Drs. Galyon, Wilson and Snieska, as well as Dr. Boscardin's report. The letter quotes the applicable Policy definition of disability for waiver of group life premiums as "a condition that prevents [claimant] from doing any work for which [he or she is] or could become qualified by education, training or experience" and then states:

Dr. Wilson felt that you were capable of sedentary work, no lifting over 10 pounds and to limit working with the left arm above the shoulder.  He felt you could do this on a full-time basis.

Dr. Galyon felt that you were capable of full-time sedentary work, no lifting over 10 pounds, no working overhead; no frequent flexion of the spine; sitting, walking and standing should be alternated at 2-hour intervals and you were capable of full-time employment.

While Dr. Snieska advised that you were unable to perform at the sedentary level because of reported weakness in your upper extremities, decreased range of motion and chronic neck pain this was contrary to what the two

-10-

surgeons had related to Dr. Boscardin.

Dr. Boscardin opined that you were not precluded from sedentary full-time work which limited lifting to 10 pounds with additional restrictions of no overhead work, no work with the left arm above the left shoulder and no work that required prolonged flexion of the cervical spine You required an opportunity to change position every 2 hours and could walk or stand frequently. These restrictions and limitations were permanent and effective from 3/8/08 onward.

Dr. Snieska felt that you were not capable of returning back to sedentary activities because of your panic attacks/anxiety depression however the claim file contains no documentation that you are experiencing panic attacks/anxiety depression symptoms of such severity that they would warrant limitations or restrictions in the work place. You do not appear to under the care of a psychologist or psychiatrist.

Based on review of the documentation in the claim file and independent physician review it appears that you are functionally capable of performing at the sedentary level.

Thereafter, plaintiff commenced this action.

**Complaint**

In the complaint in the instant action, plaintiff claims defendant wrongfully terminated her waiver of premium benefits under the group life portion of the Policy. Plaintiff argues that defendant arbitrarily and capriciously determined that she failed to prove she was prevented by her medical condition from performing "any work" within the meaning of the waiver of premium provision of the Policy. The first cause of action alleges wrongful denial of benefits, and the second alleges breach of fiduciary duty. Plaintiff requests judgment directing payment of the amount of benefits to which she is entitled; reinstatement of waiver of premium benefits; payment of the life insurance benefits on her husband's life which would have been paid under the Policy's group life provisions if the premiums had not lapsed; and attorney's fees and costs.

**Evidence on the Summary Judgment Motions**

-11-

The only additional evidentiary submissions on the motions are declarations from two representatives of defendant – Edna R. Golych and Bruce Luddy – regarding defendant's manner of handling appeals of denied or terminated benefit claims.  The first declarant, Edna R. Golych, the appeal specialist who handled plaintiff's administrative appeal, states the following based on personal knowledge:

> As an Appeal Specialist for Hartford, I do not receive any remuneration, bonus, award, recognition or other incentives to deny claims for any type of benefits (including long term disability benefits and waiver of premium benefits). My performance evaluations are based on the accuracy of my decision-making, regardless of whether my decision results in an award or denial of benefits on the claims that I review.

The second declarant is Bruce Luddy, defendant's Director of Litigation and Appeals for more than three years.  He states that he supervises the claims staff who decide appeals of denied or terminated benefit claims, including waiver of premium benefits claims. He states:

> During Hartford's review of Plaintiff Trudy L. Ramstine's claim for waiver of premium benefits under ... [the Policy], the decision to terminate Plaintiff's waiver of premium benefits was recommended by Jaclyn Nemcik, Examiner, which was approved by Ms. Nemcik's supervisor, both of whom are members of the claims department. The administrative appeal was decided by Edna R. Golych, Appeal Specialist and member of the appeal unit.
>
> When evaluating claims under employee benefit plans insured by Hartford, it is Hartford's practice and intention to review such claims fairly, without regard to the manner in which the plan is funded, and to consistently award benefits on claims that are entitled to benefits pursuant to the provisions of the applicable benefit plan, while consistently denying claims that are not entitled to such benefits.
>
> Hartford recognizes that awarding benefits on claims that are not entitled to such payments pursuant to the terms of the applicable plan does not benefit all of the persons insured under that plan as a group. Instead, such payments could result in increased premiums and/or a reduction or elimination of benefits by the employer, which would ultimately work to the detriment of all participants and beneficiaries of a given plan.

-12-

Hartford does not provide its Examiners and Appeal Specialists with any incentives, remuneration, bonuses, awards, achievements, or other recognition based in whole or in part upon the denial or termination of claims. Hartford's claims decision-makers are paid fixed salaries and performance bonuses that are wholly unrelated to the number of claims paid or claims denied.

Hartford's Examiners and Appeal Specialist are evaluated on the quality and accuracy of their claims decisions in accordance with the applicable plan documents.

Hartford does not discourage its claim decision-makers from paying legitimate claims.

Hartford maintains a separate appeal unit for the consideration of claims that have been denied by the claims department on its initial review.

Each Appeal Specialist in Hartford's appeal unit is charged with making an independent assessment of the adverse claim decision based on the relevant provisions in the governing policy or plan document and based on all of the evidence contained in the claim file.

During the Appeal Specialist's review of a denied claim on administrative appeal, the individual responsible for the appeal does not discuss the merits of the claim with the original Examiner who made the initial benefits determination.

Hartford's Examiners and Appeals Specialist do not have any role or responsibility for management, reporting, or other functions regarding Hartford's finances.

Hartford's claims department and appeal unit are completely separate business units from the financial and underwriting departments.

Neither the claims department nor the appeal unit is required to seek approval from Hartford's financial underwriters in connection with their decision-making on a claim for waiver of premium benefits.

Hartford's financial and underwriting departments do not advise or influence the claims department or appeal unit with respect to whether or not to pay a claim. Indeed, these units are kept completely separate from each other.

The office of the Chief Financial Officer of Hartford and its affiliate,

> subsidiary or parent companies does not have any involvement and does not participate in claims decisions on waiver of premium benefits at any level.

(Paragraph numbering omitted.)

## APPLICABLE LAW

Defendant has moved and plaintiff has cross-moved for summary judgment.  Summary judgment is appropriate only when there is no genuine issue with regard to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). When deciding a summary judgment motion, a court must construe all the evidence in the light most favorable to the nonmoving party and draw all inferences and  resolve all ambiguities in that party's favor. *LaSalle Bank Nat'l Ass'n v. Nomura Asset Capital Corp*., 424 F.3d 195, 205 (2d Cir. 2005). Both parties contend that there is no issue of material fact and that the Court should decide on the present record whether defendant properly terminated plaintiff's waiver of premium benefits.

In determining the proper standard of review of the defendant's determination, the Court notes that the Policy grants defendant "full discretion and authority to determine eligibility for benefits and to construe and interpret all terms and provisions of the Policy."  Where the plan administrator is granted such discretion, the applicable standard of review of a denial of benefits is the deferential "arbitrary and capricious" standard.  *See Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989); *Pagan v. NYNEX Pension Plan*, 52 F.3d 438, 441 (2d Cir. 1995). Under this standard, a court may overturn a decision to deny benefits only if it was "without reason, unsupported by substantial evidence or erroneous as a matter of law."  *Pagan*, 52 F.3d at 442 (citations omitted).

It is undisputed in the case at bar that defendant both evaluates and pays out the benefits

-14-

claims.  The Supreme Court has held that the fact that a plan administrator both evaluates claims

for benefits and pays benefits claims creates a conflict of interest that must be weighed as a factor

in determining whether there is an abuse of discretion.  *Metropolitan Life Ins. Co. v. Glenn*

("*Glenn*"), 554 U.S. 105, 128 S.Ct. 2343, 2348 (2008) (citing  *Firestone*, 489 U.S. at 115).  In

discussing the weight to be given such a conflict of interest, the *Glenn* court stated:

> [A] conflict of interest ... should prove more important (perhaps of great
> importance) where circumstances suggest a higher likelihood that it
> affected the benefits decision, including, but not limited to, cases where an
> insurance company administrator has a history of biased claims
> administration. It should prove less important (perhaps to the vanishing
> point) where the administrator has taken active steps to reduce potential
> bias and to promote accuracy, for example, by walling off claims
> administrators from those interested in firm finances, or by imposing
> management checks that penalize inaccurate decisionmaking irrespective
> of whom the inaccuracy benefits.

128 S.Ct. at 2351 (citations omitted); *accord McCauley v. First Unum Life Ins. Co.*, 551 F.3d 126,

133 (2d Cir. 2008).

In reviewing a denial of benefits, courts may also consider factors such as an

administrator's "wholesale embrace of one medical report supporting a claim denial to the

detriment of a contrary report that favors granting benefits[.]"  *McCauley*, 551 F.3d at 136 (citing

*Glenn*, 128 S.Ct. at 2352).  Other factors a court may consider include whether the decision to

terminate benefits was made in the absence of a change in the claimant's condition, and whether

the administrator relied on the opinions of its own non-treating physicians over the opinions of

the claimant's treating physicians when deciding to terminate a prior award.  *See, e.g., Connors v.*

*Connecticut Gen. Life Ins. Co.*, 272 F.3d 127, 135-36 (2nd Cir. 2001); *Smith v. Novelis,* 2009 WL

3164798, *13 (N.D.N.Y. Sept. 29, 2009).

### DISCUSSION

-15-

**Substantial Evidence**

Substantial evidence in the record supports defendant's decision to terminate plaintiff's waiver of premium benefits as of March 7, 2008 and its decision to uphold the termination on the administrative appeal.  The termination letter summarized the recent medical reports defendant had received from Drs. Wilson, Galyon, and Snieska, and found, based on these reports, that plaintiff should be able to return to work part time on light duty with specified restrictions.  The February 14, 2008 Report from Dr. Wilson, who had performed the surgery on plaintiff's left shoulder and treated her for a right knee condition, stated that he had examined plaintiff on September 28, 2007 with regard to her left shoulder and on January 29, 2008 with regard to her right knee.  He checked "Yes" and wrote "light duty" in response to the question whether plaintiff was "capable of performing part time work (any occupation) on a reasonable and consistent basis beginning 3/1/2008."  He wrote that plaintiff should not engage in any lifting, pushing or pulling of more than 10 pounds, should not work overhead, should not stand or walk for more than 45 minutes at a time (without a sitting 10-15 minute rest), and should not climb. There is no basis to find that these limitations are inconsistent with his conclusion that she was able to perform light-duty part-time work.

In his February 18, 2008 Report to defendant, plaintiff's neurosurgeon, Dr. Galyon, commented that as of his February 4, 2008 examination, plaintiff's activities were limited by her need to change between sitting and standing every 30 minutes, and that she should not lift, push or pull more than 20 pounds. As to whether plaintiff was "capable of performing part time work (any occupation) on a reasonable and consistent basis beginning 3/1/2008" he did not check "yes" or "no" but wrote: "She does have other medical problems including shoulder surgery[,]" and

-16-

added: "I would recommend a FCE for her functional status and if she would be employable."

While Dr. Galyon's report did not state whether or not plaintiff was capable of part-time work,

the limitations he cited are similar to those cited by Dr. Wilson and do not appear to rule out such

work.  Dr. Galyon's uncertainty as to whether plaintiff could work seems to stem from his lack of

knowledge about the effect of her shoulder condition; this concern was addressed by Dr. Wilson,

who treated her for the shoulder condition and concluded that it did not preclude light-duty part-

time work.  In any event, Dr. Galyon did not state that the condition for which he treated plaintiff

– neck pain – prevented her from working.

According to the February 22, 2008 report by plaintiff's family doctor, Dr. Snieska, when

he examined plaintiff on March 2007 she complained that her legs were very weak and "giving

out on her" and that she had "weakness in the right knee and also pain in the shoulder[.]"  He

noted she had recently been diagnosed with a rotator cuff tear (which he incorrectly ascribed to

the right instead of left shoulder).  There is no indication that he had examined plaintiff at any

time regarding her neck, shoulder, or knee problems, or that he had any objective medical basis to

contradict the conclusions reached by Drs. Wilson and Galyon, who treated her for those

problems.  Nor is there any indication that his conclusion that plaintiff was not "capable of

returning to work in any capacity at this time" was based on anything other than plaintiff's own

descriptions of her health problems and limitations.  Moreover, he had not examined plaintiff for

almost a year.

Thus, defendant's conclusion that plaintiff was capable of light-duty part-time work with

specified restrictions was fully supported by Dr. Wilson's description of plaintiff's physical

limitations and his conclusion that she was capable of such work.  It was further supported by Dr.

-17-

Galyon's reports describing plaintiff's physical limitations.  Further, given the lack of objective

medical evidence cited by Dr. Snieska, it cannot it be said that defendant's reliance on Dr.

Wilson's opinion rather than Dr. Snieska's regarding plaintiff's ability to work was arbitrary or

capricious.  Defendant's termination of waiver of premium benefits was supported by substantial

evidence in the administrative record.

The additional evidence submitted on plaintiff's administrative appeal does not alter this

conclusion.  In support of her appeal, plaintiff submitted the "Attending Doctor's Report and

Carrier/Employer Billing Form" ("Workers' Comp Report") recently completed by Dr. Galyon

concerning plaintiff's claim for Workers' Compensation benefits.  Based on his examination of

plaintiff on February 4, 2008, Dr. Galyon filled out the Workers' Comp Report as follows: to the

question whether plaintiff was  working, he checked "No"; and to the question whether she was

"Unable to perform regular duties or work" he checked "Yes" and indicated that her degree of

impairment was "Partial."  In response to questions which were to be completed only "when

maximum medical improvement has been reached" he stated that the loss to her extremity was

75% and checked "No" in response to the question whether the patient "can do any type of work."

Dr. Galyon based the Workers' Comp Report on his February 4, 2008 examination of plaintiff –

the same examination on which he based his February 18, 2008 Report to defendant, in which he

declined to state an opinion on whether plaintiff was capable of performing part-time work and

recommended a functional capacity examination to determine whether she was employable.  In

contrast to the February 18, 2008 Report, the Workers' Comp Report made no specific findings

regarding plaintiff's physical restrictions (such as, for example, the need to change between

sitting and standing every 30 minutes).  The record does not enable the Court to reconcile these

two reports.  One possible explanation for the seeming inconsistency may be the fact that, as the

Second Circuit states:

> The term 'disability' has a variety of meanings, depending on the context in which it is used." *See, e.g.*, 42 U.S.C. § 423(d)(1) (Social Security disability insurance benefits); New York Work. Comp. Law §§ 37, 201(9). Statutory definitions such as these are not binding in the instant case.

*Kunstenaar v. Connecticut Gen. Life Ins. Co.*, 902 F.2d 181, 184 (2d Cir. 1990) (upholding denial

of long-term disability benefits under policy provided by employer).  Thus, while Dr. Galyon's

reports contribute significant medical information to the administrative record, they are

inconclusive on the question of whether plaintiff is disabled within the meaning of the waiver of

premium portion of the Policy.

Additional evidence considered on the appeal was the May 20, 2008 report by James B.

Boscardin, M.D., an orthopedic surgeon who performed the independent medical record review

for defendant.  Dr. Boscardin summarized and discussed plaintiff's medical records and the

reports from Drs. Wilson, Galyon, and Snieska.

Dr. Boscardin also spoke with each of the three physicians by telephone.  He reported that

when he spoke with Dr. Wilson on May 13, 2008, Dr. Wilson "confirmed" his opinion that

plaintiff "was capable of sedentary work, no lifting over 10 [pounds] and to limit working with

the left arm above the shoulder" and that she "could do this on a full time basis."

Dr. Boscardin also reported that on May 16, 2008 he spoke by telephone with Dr. Galyon.

According to Dr. Boscardin, Dr. Galyon told him that he had last seen plaintiff on May 8, 2008,

"at which time he felt that she was capable of full time sedentary work, no lifting over 10

[pounds], no working overhead, no frequent flexion of the spine, sitting, walking and standing

should be alternated two hour intervals and she was capable of full time employment."

-19-

Dr. Boscardin also discussed Dr. Snieska's opinion.  He noted that, when Dr. Snieska wrote on February 22, 2008 that plaintiff was unable to work, Dr. Snieska had not seen plaintiff since March 2007.  Dr. Boscardin also noted that in their teleconference on May 16, 2008, Dr. Snieska told him that as of April 28, 2008 plaintiff "complained of pain in her neck, decreased range of motion, weakness in her arms and inability to do anything"; that her husband had recently died; that plaintiff was suffering from panic attacks; and that she "was not capable of returning back to sedentary activities because of her complaints and her panic attacks/anxiety depression." Dr. Boscardin observed that, to the extent that Dr. Snieska's opinion was based on plaintiff's self-reported neck pain and right arm weakness, it was contrary to the opinion of plaintiff's neurosurgeon Dr. Galyon and her shoulder surgeon Dr. Wilson.  Dr. Boscardin concluded, based on a reasonable degree of medical certainty, that plaintiff "is not precluded from sedentary full time work which limits lifting to 10 [pounds] with additional restrictions of no overhead work, no work with the left arm above the left shoulder and no work that requires prolonged flexion of the cervical spine. She requires an opportunity to change position every two hours and she may walk or stand frequently."  He added that he "speak[s] from an orthopedic standpoint in establishing the above restrictions and limitations" and that he has "no expertise in commenting on [the] anxiety, depression and panic attack situations" cited by Dr. Snieska.

On May 27, 2008, after summarizing the appeal record, including plaintiff's medical records and her treating physicians' reports as well as Dr. Boscardin's report, defendant upheld the termination of plaintiff's waiver of premium benefits as of March 7, 2008.  It is clear from the appeal decision that defendant did not simply adopt Dr. Boscardin's point of view, and there is no merit to plaintiff's contention that defendant improperly relied primarily on the opinion of its

expert.  Moreover, Dr. Boscardin's report itself is supported by and consistent with substantial evidence in the record.[2]  Accordingly, based on the entire administrative record, the Court finds substantial evidence to support defendant's conclusion on appeal to uphold the termination of plaintiff's waiver of premium benefits.

**Conflict of Interest**

In arguing that defendant arbitrarily and capriciously terminated her waiver of premium benefits, plaintiff relies heavily on the fact that defendant both evaluates and pays out the benefits claims.  Plaintiff points out that this fact creates a conflict of interest that must be weighed as a factor in determining whether there is an abuse of discretion.  *See Glenn*, 128 S.Ct. at 2348.  The importance of such a conflict depends on the circumstances of the particular case.  For example, as the *Glenn* court explained, a conflict "should be more important (perhaps of great importance) where circumstances suggest a higher likelihood that it affected the benefits decision, including, but not limited to, cases where an insurance company administrator has a history of biased claims administration."  *Id.* at 2351.  On the other hand, "[i]t should prove less important (perhaps to the vanishing point) where the administrator has taken active steps to reduce potential bias and to promote accuracy, for example, by walling off claims administrators from those interested in firm finances, or by imposing management checks that penalize inaccurate decisionmaking irrespective of whom the inaccuracy benefits."  *Id.*

---

[2] The Court is aware that both Dr. Boscardin's report and the appeal decision referred to Dr. Boscardin's hearsay statement that, during their teleconference, Dr. Galyon told him that plaintiff was capable of full-time work as of May 8, 2008.  In some circumstances, reference to a hearsay opinion that differs from the written records might well be problematic.  Here, however, even without Dr. Galyon's hearsay opinion, there is substantial evidence to support defendant's appeal determination.  Indeed, the hearsay statement was not before defendant when it reached its initial decision to terminate plaintiff's benefits, a decision that was supported by substantial evidence.  Further, although defendant did cite the hearsay statement in its appeal decision, it did not rely on it heavily or to the exclusion of other evidence, and there is no reason to believe that defendant would have reached a different decision on appeal if the hearsay statement had not been before it.

Defendants rely on the declaration from Edna R. Golych, the appeal specialist who handled plaintiff's appeal, stating that she "do[es] not receive any remuneration, bonus, award, recognition or other incentives to deny claims for any type of benefits (including long term disability benefits and waiver of premium benefits)." She adds: "My performance evaluations are based on the accuracy of my decision-making, regardless of whether my decision results in an award or denial of benefits on the claims that I review."

Defendants also rely on the declaration from Bruce Luddy, Director of Litigation and Appeals at the time in question. He is responsible for supervising the staff who decide appeals of denied benefit claims, including waiver of premium benefits claims. He affirms that the initial decision to terminate plaintiff's waiver of premium benefits was recommended by an examiner and approved by her supervisor, both members of the claims department. Ms. Golych, the appeal specialist who decided plaintiff's administrative appeal, was a member of the appeal unit. Mr. Luddy affirms that defendant does not provide its examiners and appeal specialists with any incentives based on the denial or termination of claims; that they are paid fixed salaries and performance bonuses unrelated to the number of claims paid or denied; that they are evaluated on the quality and accuracy of their claims decisions in accordance with the applicable plan documents; that defendant maintains a separate appeal unit for the consideration of claims that have been denied by the claims department on its initial review; that the individual responsible for the appeal does not discuss the merits of the claim with the original examiner who made the initial benefits determination; that the examiners and appeal specialists have no responsibilities regarding defendant's finances; that the claims department and appeal unit are completely separate business units from the financial and underwriting departments; and that defendant's

-22-

financial and underwriting departments do not advise or influence the claims department or

appeal unit with respect to whether or not to pay a claim.  Plaintiff submits no evidence to the

contrary.

The declarations of Ms. Golych and Mr. Luddy demonstrate that defendant has taken

active steps to reduce potential bias and to promote accuracy, including "walling off claims

administrators from those interested in firm finances"; separating the claims unit from the appeal

unit; evaluating performance based on the accuracy of decision-making, not on whether the

decision results in an award or denial of benefits; and giving no incentive to deny benefit claims.

*See id.*; *Fortune v. Group Long Term Disability Plan*, 637 F.Supp.2d 132, 144 (E.D.N.Y. 2009).

Nor do the circumstances otherwise suggest a substantial likelihood that the conflict affected the

benefits decision.  Accordingly, the Court finds that the conflict of interest is a factor of little

significance in reviewing the termination of plaintiff's waiver of premium benefits.

**Procedural Irregularities**

Plaintiff contends there are "procedural irregularities" in defendant's handling of her

claim that militate against upholding the termination of her waiver of premium benefits.  One

such alleged irregularity is defendant's determination that plaintiff is no longer eligible for waiver

of premium benefits despite the fact that she continued to be eligible for LTD benefits.  It is,

however, plain on the face of the Policy that the qualifications for the two types of benefits differ.

The LTD portion of the Policy in effect at the time[3] defines disability as being "prevented from

---

[3] Plaintiff was first awarded LTD benefits as of November 19, 2005 (after a 180-day elimination period from the date of disability), based on the Policy definition of disability as: "you are prevented ... from performing one or more of the Essential Duties of Your Occupation, and as a result your Current Monthly Earnings are no more than 80% of your Indexed Pre-Disability Earnings."  Plaintiff's continuing LTD benefits, awarded after 24 months, were based on the Policy definition of disability as "you must be ... prevented from performing one or more of the Essential Duties of Any Occupation."

performing one or more of the Essential Duties of Any Occupation" and defines "Any Occupation" as "an occupation for which you <u>are qualified</u> by education, training or experience[.]" (Emphasis added.)  In contrast, the waiver of premium provision defines disability as "a condition that prevents You from doing any work for which You <u>are or could become qualified</u> by education, training or experience."  (Emphasis added.)  It is not necessary to parse the difference between "occupation" and "work"; the obvious difference between "are qualified" and "are <u>or could become</u> qualified" is conclusive on this issue.[4]

Plaintiff also argues that defendant improperly emphasized the medical report of Dr. Boscardin over the medical reports of plaintiff's treating physicians.  *See, e.g., McCauley*, 551 F.3d at 136 (stating that an administrator's "wholesale embrace of one medical report supporting a claim denial to the detriment of a contrary report that favors granting benefits" indicated an abuse of discretion).  There is no support for this argument; it is clear from the appeal decision that defendant discussed and relied on the reports of all three treating physicians as well as Dr. Boscardin's report in reaching its determination.

Likewise, there is no merit to plaintiff's suggestion that more weight should have been given to the opinion of Dr. Snieska, plaintiff's family physician, as opposed to the opinions of her specialists.  With respect to whether plaintiff's neck and shoulder issues were disabling, the appeal decision discussed the views of all three treating physicians and reasonably placed more emphasis on the views of the neurosurgeon and orthopedic surgeon than on Dr. Snieska's view,

---

[4] Moreover, the waiver of premium portion of the Policy contains no minimum income requirement, whereas the LTD portion of the Policy defines "Any Occupation" as "an occupation for which you are qualified by education, training or experience and that has an earnings potential greater than an amount equal to the lesser of the product of your Indexed pre-disability Earnings and the Benefit Percentage for which you enrolled and the Maximum Monthly Benefit shown in the Schedule of Insurance."

particularly because his report contained no findings regarding physical limitations.  Nor was it

arbitrary for defendant to give little weight to Dr. Snieska's opinion, which he stated in his

teleconference with Dr. Boscardin, that plaintiff "was not capable of returning back to sedentary

activities because of ... her panic attacks/anxiety depression."  The appeal decision correctly noted

that the claim file contained no documentation that plaintiff was "experiencing panic

attacks/anxiety depression symptoms of such severity that they would warrant limitations or

restrictions in the work place" or that she was under the care of a psychologist or psychiatrist.[5]

Nor does the Court find a procedural irregularity related to defendant's conduct in

requiring plaintiff to apply for Social Security Disability benefits while denying waiver of

premium benefits.  Indeed, the Policy itself requires that all LTD claimants apply for Social

Security Disability benefits.  Further, the definition of disability for purposes of Social Security

Disability eligibility, *see* 42 U.S.C. § 423(d)(1) (defining "disability" as "inability to engage in

any substantial gainful activity by reason of any medically determinable physical or mental

impairment..."), differs significantly from the Policy definition of disability for purposes of

waiver of premium benefit eligibility.  *See Kunstenaar*, 902 F.2d at 184 ("The term 'disability'

has a variety of meanings, depending on the context in which it is used.").

Plaintiff also argues that the decision to terminate her waiver of premium benefits was

arbitrary and capricious because there was no information upon which defendant could find that

her condition had changed significantly since she was initially found eligible.  *See, e.g., Connors*,

272 F.3d at 136; *Rappa v. Connecticut Gen. Life Ins. Co.*, 2007 WL 4373949, *10 (E.D.N.Y.

---

[5] Dr. Snieska's office notes indicate that he prescribed medication to treat plaintiff for depression in 2005 and 2006.  His note dated August 28, 2006 assessed her depression as "controlled."  The Court finds no subsequent reference to the issue in the administrative record, except for Dr. Boscardin's hearsay statement regarding his telephone conversation with Dr. Snieska.

Dec.11, 2007).  Defendant initially found plaintiff eligible for waiver of premium benefits as of February 20, 2006.  This determination and the continuation of such benefits thereafter were supported by evidence from her treating physicians, including a number of reports of temporary total disability from Dr. Galyon in 2005 and 2006, and a report from Dr. Wilson on June 22, 2007 that plaintiff was unable to work at that time.  Shortly before terminating the waiver of premium benefits on March 7, 2008, defendant received for the first time a report from a treating physician expressly stating that plaintiff was able to work, *i.e.*, Dr. Wilson's February 14, 2008 Report answering "Yes" and "light duty" to the question of whether plaintiff was "capable of performing part time work (any occupation) on a reasonable and consistent basis beginning 3/1/2008" and further stating that plaintiff "should be able to return to light duty and increase hours in a controlled fashion."  Dr. Galyon's reports from December 20, 2007 and February 18, 2008 do not expressly state whether plaintiff can work, but the physical limitations specified therein do not appear to preclude sedentary part-time light-duty work, nor do they plainly contradict Dr. Wilson's February 14, 2008 Report.  This and other evidence supported a finding that plaintiff's condition had changed since she was awarded waiver of premium benefits.

The Court has reviewed the other issues raised by plaintiff.  Upon review of the entire administrative record, the Court finds no basis to conclude that the administrative decision was arbitrary or capricious, without reason, unsupported by substantial evidence, or otherwise represented an abuse of discretion.  Further, there is no basis in the record to find that defendant breached any fiduciary duty to plaintiff.  The Court grants defendant's motion for summary judgment (Dkt. No. 24), denies plaintiff's cross motion for summary judgment (Dkt. No. 25), and dismisses the action.

-26-

**CONCLUSION**

It is therefore

ORDERED that defendant's motion for summary judgment (Dkt. No. 24) is granted; and it is further

ORDERED that plaintiff's cross motion for summary judgment (Dkt. No. 25) is denied; and it is further

ORDERED that the action is dismissed on the merits.

IT IS SO ORDERED.

Date:    September 14, 2010
         Syracuse, New York

_____
Norman A. Mordue
Chief United States District Court Judge

-27-